# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAULA GORDON, | Case No.: 1:18-cv-0007 - DAD - JLT |
| Plaintiff, | ORDER GRANTING DEFENDANT'S MOTION FOR DISCOVERY |
| v. | |
| NEXSTAR BROADCASTING, INC., et al., | (Docs. 69, 71) |
| Defendants. | |

Paula Gordon contends she suffered sexual harassment as an employee of the defendants. She alleges the defendants are liable sexual harassment, discrimination and retaliation in violation of the Fair Employment and Housing Act, violation public policy, and intentional infliction of emotional distress. Defendants contend Plaintiff was "motivated… to make… unsubstantiated allegations of harassment" due to a romantic involvement with an individual who had an account with the defendants, and seeks to compel further testimony from Plaintiff regarding that relationship. (Docs. 69, 71)

The Court found the matter suitable for decision without oral argument, and took the matter under submission pursuant to Local Rule 230(g). (Doc. 72) For the following reasons, Defendants' motion to compel discovery is **GRANTED**.

## I. Background

Plaintiff alleges she was hired in December 2012 as an account executive, "to perform in the business of television media sales," and her "$120,000 salary was based on commission only." (Doc.

14 at 5, ¶ 15) She contends that after the defendants hired Erik Mendoza as a sales manager in August 2013, she "suffered from constant and egregious sex harassment." (*Id.*, ¶ 16) Plaintiff asserts she "was subjected to a constant stream of sex harassment, including, inappropriate touching, and obscene and sexually vulgar comments and exhibitions." (*Id.*, ¶17) She alleges that "acts of harassment were performed in front of other persons, including persons working both for and working with Defendants." (*Id.*) According to Plaintiff, "Defendants "tolerated, acquiesced, encouraged, failed to protect, failed to investigate and allowed to exist, a hostile, oppressive, dangerous and violent work environment for Plaintiff as created by [Mendoza]." (*Id.*)

Plaintiff alleges that in February 2016, she complained to her supervisor Derek Jeffery, the General Manager of Nexstar, that "Adam Chase, would constantly threaten Plaintiff's job by stating he could take away any of her business accounts." (Doc. 14 at ¶¶ 8, 19) She asserts, "Mr. Chase took away at least eight (8) of Plaintiff's accounts and inexplicably gave many of them to [Mendoza]." (*Id.* at 7, ¶19) Plaintiff reports she cried in front of Jeffrey, who responded that Plaintiff was "being way too emotional" and said he "wouldn't go to [his] boss crying." (*Id.*) Plaintiff asserts that "[i]n June 2016, once Mr. Chase left his position with Defendants, [Jeffery] told Plaintiff that Mr. Chase 'hated' Plaintiff because 'he (Mr. Chase) hated women, particularly strong women.'" (*Id.* at 8, ¶19)

She asserts that in July 2016, Mendoza was promoted to local sales manager, a position which made him Plaintiff's supervisor. (Doc. 14 at 6, ¶18) Plaintiff alleges that at the time of the promotion, she described Mendoza's "constant egregious and sexually inappropriate comments and actions" to Alma Navarrete, the General Sales Manager and another supervisor over Plaintiff. (*Id.*, ¶¶ 7, 20) Navarrete told Plaintiff to "[j]ust ignore him." (*Id.* at 8, ¶ 20) She contends that year, she also described Mendoza's "offensive and vulgar sexual comments and physical touching, photos and videos to Navarrete, who "discouraged Plaintiff from filing a complaint with Defendants." (*Id.*, ¶ 23) Plaintiff asserts that Navarrete reported this conversation to Jeffery. (*Id.*)

According to Plaintiff, Mendoza was "investigated by Defendants for sexually harassing another subordinate" after another female account executive, Alyssa Duran, reported Mendoza as sexually harassing her in November 2016. (Doc. 14 at 8, ¶ 21) Plaintiff asserts she was not interviewed related to Mendoza's behavior toward Duran, but was instead asked to "describe her 'relationship' with

her fellow female Account Executive." (*Id.*) She alleges Ms. Duran was on leave during the investigation while Mendoza kept working, and after the leave ended, Navarrete told Plaintiff: "[W]e are going to make sure Duran quits. We aren't going to give her another account. She is out of here.'" (*Id.*, ¶ 22) Plaintiff contends that from this, she "learned what Defendants do to women who complain of sex harassment." (*Id.*)

On January 12, 2017, Navarrete told Plaintiff that Jeffery wanted to meet with her. (Doc. 14 at 8, ¶ 24) Plaintiff asserts that during the meeting, Jeffery informed Plaintiff that Navarrete had reported Plaintiff's complaints of sexual harassment and abuse by Mendoza." (Doc. 14 at 8-29, ¶ 24) Jeffery asked Plaintiff if Mendoza made "just comments," to which Plaintiff responded the harassment was also physical. (*Id.* at 9, ¶ 24) According to Plaintiff, Jeffrey responded, ""You should have done what my wife would have done, you should have kicked Erik in the balls." (*Id.*) Jeffrey then "abruptly" ended the meeting with Plaintiff and Navarrete. (*Id.*) Later that day, Navarrete went to Plaintiff and said Plaintiff was jeopardizing [Navarrete's] job by telling her the information about Mendoza." (*Id.*, ¶ 25) In response, Plaintiff told Navarrete that she could not "pick and choose" what information she told Jeffrey, and asked why Navarrete did not tell Jeffrey about Mendoza "showing pictures of his penis and videos of him masturbating." (*Id.*) According to Plaintiff, Navarrete then responded: "Don't tell me! I don't want to know!" (*Id.*)

Plaintiff asserts she again met with Jeffery regarding Mendoza's conduct the following day, on January 13, 2017. (Doc. 14 at 9, ¶ 26) Jeffery again asked Plaintiff whether it "[w]as … more than just comments." (*Id.*) She alleges that she responded, "yes, as I told you, it was also physical. Alma [Navarrete] knows everything." (*Id.*) Plaintiff added, "I told Alma everything last year." (*Id.*) She contends that after the meetings with Jeffery and Navarrete, her "sex harassment complaints were just ignored" and "Defendants did not contact Plaintiff regarding her sexual harassment allegations and complaints." (*Id.*, ¶ 27)

On January 24, 2017, Plaintiff fold Jeffery "that her medical doctor ordered her on a leave of absence to address Plaintiff's trauma and non-stop hostile workplace." (Doc. 14 at 9, ¶ 28) In April 2017, while Plaintiff remained on leave, she "voluntarily participated in an investigation conducted by an attorney who was hired by Defendants to investigate Plaintiff's sex harassment claims." (*Id.* at 9-10,

¶ 29) She asserts the investigation concluded in June 2017, and "[t]he investigator found that Defendant Mendoza had sexually harassed Plaintiff." (*Id.*, ¶ 30)

According to Plaintiff, "Defendants demanded that Plaintiff immediately return to work." (Doc. 14 at 10, ¶ 31) She asserts that she "was suffering severe emotional distress from the abuse and mistreatment by Defendants," and "feared that if she returned to work, she, like other sex harassment victims of Defendants, would be retaliated against by the Local Sales Manager, her bosses, and the entire management team." (*Id.*) On July 31, 2017, Plaintiff was fired, and replaced by Lupe Carbajal, "who Defendants[] knew had sexually harassed Plaintiff at a previous job." (*Id.*, ¶¶ 32- 33)

Plaintiff filed claims with the California Department of Fair Employment and Housing, which "granted the right to sue." (Doc. 14 at 13, ¶ 45) On September 22, 2017, Plaintiff filed a complaint in the Los Angeles County Superior Court. (*See* Doc. 1 at 2, ¶ 1) Plaintiff identified the following causes of action: (1) statutory harassment, (2) gender discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), (3) violation of public policy, (4) retaliation in violation of FEHA, (5) and intentional infliction of emotional distress. (*See id.* at 10, 19-26)

Nexstar filed a notice of removal on October 31, 2017, thereby removing the action to the Central District of California. (Doc. 1) Plaintiff filed an amended complaint (Doc. 14), after which she also voluntarily dismissed The CW Network as a defendant (Doc. 25) and voluntarily dismissed the first cause of action for harassment as to Derek Jeffery and Alma Navarrete (Doc. 26). Thus, the defendants remaining in the action are Nexstar Broadcasting, Telemundo 17.3, KGET-TV 17, and Erik Mendoza. (*See* Doc. 14 at 10) On December 28, 2017, the Central District transferred the action to the Eastern District of California, thereby initiating the action before this Court. (Doc. 45) T

The Court issued new civil case documents and set a scheduling conference for April 2, 2018. (*See* Docs 48, 56) At the scheduling conference, the parties were directed to complete non-expert discovery no later than February 15, 2019. (Doc. 58 at 2) The parties began discovery, and participated in mid-discovery status conference with the Court on September 10, 2018. (Doc. 64) The parties agreed to limit Plaintiff's deposition to 12 hours, without prejudice to bringing a motion. (*Id.*)

Plaintiff appeared for her deposition on September 24, 2018. (*See* Doc. 71 at 2; Doc. 71-1 at 4) "During the deposition, Plaintiff testified that Mendoza touched her leg during an event in September

2016," when "Ted Nicholas, President of Nexstar's client, 3 Way Chevrolet, was the only witness who told her that he witnessed the alleged touching." (Doc. 71 at 2) She also testified "she is presently in a romantic relationship with Nicholas and that their relationship started around February 2017." (*Id.*) Counsel for Nexstar "asked Plaintiff to describe the nature of her relationship with Nicholas in December 2016, in particular, whether Plaintiff and Nicholas were in a romantic relationship at the time when they were seeking to get the 3 Way Chevrolet account transferred from Mendoza to Plaintiff, and when Plaintiff complained that Mendoza sexually harassed her." (*Id.*) Plaintiff's counsel objected to the questioning and instructed Plaintiff not to answer the questions "on the asserted bases of privacy and relevance." (*Id.*)

The Court held an informal telephonic conference with the parties on October 3, 2018. (Doc. 66) Because the dispute was not resolved, the defendants were authorized to file a motion to compel the further testimony of Plaintiff. (*Id.*) In October 9, 2018, the defendants filed a notice of the motion now before the Court. (Doc. 69) The parties filed their joint statement regarding the discovery dispute on November 1, 2018. (Doc. 71).

## II. Scope of Discovery

The scope and limitations of discovery are set forth by the Federal Rules of Civil Procedure. In relevant part, Rule 26(b) states:

> Unless otherwise limited by court order, parties may obtain discovery regarding any nonprivileged manner that is relevant to any party' claim or defense - including the existence, description, nature, custody, condition, and location of any documents or other tangible things . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the accident. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b). Relevance is interpreted broadly, based on the general principal that litigants have a right to 'every man's evidence' . . . and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993), quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950) (internal citation omitted).

A party seeking discovery may move for an order compelling an answer when a deponent fails to answer a question. *See* Fed. R. Civ. P. 37(b). Once the party seeking discovery establishes that a

request seeks relevant information, "[t]he party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Global Ampersand, LLC v. Crown Eng'g & Constr.,* 261 F.R.D. 495, 499 (E.D. Cal. 2009), quoting *Oakes v. Halvorsen Marine Ltd*., 179 F.R.D 281, 283 (C.D. Cal. 1998); *see also Blankenship v. Hearst Corp*., 519 F.2d 418, 429 (9th Cir. 1975) (requiring defendants "to carry heavy burden of showing why discovery was denied"). Thus, a party's right to relevant discovery is not limitless. For example, the Court "can limit discovery if it determines, among other things, that the discovery is: (1) unreasonably cumulative or duplicative; (2) obtainable from another source that is more convenient, less burdensome, or less expensive; or (3) the burden or expense of the proposed discovery outweighs its likely benefit." *See Favale v. Roman Catholic Diocese of Bridgeport*, 235 F.R.D. 553, 558 (D. Conn. 2006) (internal quotation marks omitted).

**III.  Discussion and Analysis**

Defendants note that Plaintiff testified Mendoza touched her leg in September 2016, which was witnessed by Ted Nicholas, who was the president of, Three-Way Chevrolet, which was purchasing advertising from KGET and was a client of Nexstar. (Doc. 71 at 2, citing Depo. 84:11-86:6; *see also* Doc. 71-1 at 11, Depo. 128:15-21) Plaintiff testified that Mr. Nicholas sought to have the Three-Way Chevrolet account handled by Plaintiff, as early as October 2016. (Doc. 71-1 at 12, Depo. 142:2-143:20) In addition, she testified that her relationship with Mr. Nicholas turned from friendship to romantic around February 2017, after she left Nexstar. (*Id.* at 11, Depo. 129:4-19)

Defendants observe that on December 14, 2016, treatment notes from Plaintiff's therapist included the following:

> Met a man, feels very intensely as does he, but he's still legally married, though unhappily with children …. [illegible] is confused, but knows she can't wait for him to get a divorce in a few years.  Frustrated, confused.

(Doc. 71 at 7) During the deposition, Plaintiff acknowledged that she made this statement to her therapist and said that she "was referring to Ted." (Doc. 71-1 at 14)

In addition, the therapist's notes from December 22, 2016 include the following: "Also frustrated with T, they had a great weekend in Denver, but he goes home to his wife (in legal sense only). [Illegible] feels all of the old feelings she used to have with [illegible], and won't do that again."

(Doc. 71 at 7) Mr. Sevilla, counsel for Nexstar, attempted to question Plaintiff regarding this statement during the deposition, asking Plaintiff if she was referring to Mr. Nichols at that time. (*See* Doc. 71-1 at 14-15) Plaintiff responded, "I don't know," as her attorney, Mr. Smith, instructed her to not answer. (*Id.* at 15, Depo. 170:13-17) When Plaintiff was again asked if she was "referring to Ted" and if she went "to Denver with Ted Nicholas," Mr. Smith instructed her not to answer the questions. (*Id.*, Depo. 173:8-13) Mr. Smith objected to the questioning on the grounds of relevance and right of privacy. (*Id.*, Depo. 172:17-20)

Defendants now seek "an order compelling Plaintiff to respond to cross-examination questions related to the nature of her relationship with [Ted] Nicholas, including answering whether or not the 'T' in her therapy notes referred to Nicholas." (Doc. 71 at 17) Defendants contend their "theory of the case is that Plaintiff's initiation of or efforts to initiate a romantic involvement with Nicholas in December 2016 is what motivated Plaintiff to desire to take over Nicholas' account from Mendoza, which in turn motivated her to make her unsubstantiated allegations of harassment against Mendoza." (*Id.*) Plaintiff argues the requested evidence is not relevant and "is solely designed to embarrass Ms. Gordon and Mr. Nicholas, whose deposition is set for December 7, 2018. (*Id.* at 18-19)

### A. Merits of the Defense

As an initial matter, the Court notes that Plaintiff objects to the requested discovery by attacking the merits of the defense related to the motivation of Plaintiff to fabricate sexual harassment allegations against Mendoza. Specifically, Plaintiff argues "[the] so-called theory of 'motivation makes no sense, is illogical, and [is] completely destroyed by the facts." (Doc. 71 at 3) Plaintiff supports this contention by asserting Mr. Nicholas requested Plaintiff handle the account "well before any social relationship was formed between Ms. Gordon and Mr. Nicholas," and asserting that "Mr. Nicholas could simply pull the account from Nexstar if he saw fit." (*Id.* at 18) She also reports that the Three-Way Chevrolet account was transferred to her on January 12, 2017. (*Id.* at 19) Based upon these facts, and additional statements made during the deposition, Plaintiff contends the theory of motivation "makes no sense" and lacks merit. (*See id.* at 5, 18-19)

Significantly, whether Defendants' theory of the case is viable is not at issue at this juncture, and the Court need not weigh the merits of the defense. "A party may not resist discovery by

challenging the merits of a claim or defense…. Discovery exists to determine if a claim or defense has merit; discovery does not exist to adjudicate the merits of claims and defenses that have not yet been substantiated." *FTC v. AMG Servs.*, 2015 WL 5097526, at *8 (D. Nev. Aug. 28, 2015) (citing *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2257-58 (2014)). Accordingly, Plaintiff's challenge to the merits of the defendants' theory of the case is not evaluated because it is not a proper basis for resisting discovery.

### B. Relevance

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevancy to a subject matter is interpreted "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).

Defendants seek "information as to whether Plaintiff and Nicholas were working towards having more than a platonic relationship in December 2016, intimate or otherwise." (Doc. 71 at 7-8) As noted above, Defendants' theory of the case is that Plaintiff was motivated by the relationship to accuse Mendoza of harassment. Defendants thus argue that "the nature of Nicholas' relationship with Plaintiff during the relevant time frame (October 2016-January 2017) is highly relevant as to Plaintiff's motive for accusing Mendoza of harassment and whether her complaints against Mendoza were actually true." (*Id.* at 7) Defendants observe:

> Plaintiff testified that, as of December 26, 2016, she did not have an intimate or romantic relationship with Nicholas. (Yang Decl., ¶2, Ex. A, Gordon Dep. 101:21-102:25.) However, Plaintiff qualified her response based on her own definition that "romantic" solely meant "intimate," and she said "no." (Yang Decl., ¶2, Ex. A, Gordon Dep. 106:5-13). When Plaintiff testified that her "romantic" relationship with Nicholas started on February 2017, she again qualified her response based on her counsel's understanding of the term "romantic." (Yang Decl., ¶2, Ex. A, Gordon Dep. 129:4-19.)

(Doc. 71 at 7) According to Defendants, they "are seeking to clarify what Plaintiff meant when she testified to having a platonic relationship with Nicholas as of December 26, 2016," and the questions are not "solely posed for 'impeachment.'" (*Id.* at 8)

Plaintiff argues she "not placed her relationship with Mr. Nicholas (who is married but going

8

through a divorce) in issue," and the information sought by Defendants is irrelevant. (Doc. 71 at 8) According to Plaintiff, "[a] platonic relationship changes to a romantic relationship when there becomes physical intimacy." (*Id.*) Thus, Plaintiff contends that although Defendants assert they are not seeking "'any evidence of Plaintiff's or Nicholas' sexual behavior,' that is precisely what they seek by arguing that there was a 'romantic' relationship in December 2016." (*Id.*) Further, she argues the status of the relationship in December "pertains merely to impeachment on a collateral issue," such as when plaintiff denies an affair. (*Id.* at 9-10, citing *Winfred D. v. Michelin North America, Inc.*, 165 Cal.App.4th 1011 (2008)) Because impeachment on a collateral issue is improper, Plaintiff contends Defendants are not entitled to the additional discovery related to the affair. (*Id.* at 11, citing *Ortiz v. Yates*, 704 F.3d 1026, 1038 (9th Cir. 2012))

1. Whether the evidence relates only to a collateral issue

As Plaintiff observes, in *Winfred D.*, the California state court considered whether information sought related to the plaintiff's extramarital affair was relevant evidence. The plaintiff had suffered a severe brain injury when transporting produce, and filed a personal injury action against the designer and manufacturer of a tire that delaminated, saying it caused his vehicle to rollover. *Id.*, 165 Cal.App.4th at 1014. During the trial, the "court permitted defendants to introduce evidence that, while plaintiff was married to his first wife, he had an affair with, and later married, his business partner's wife; he then had two wives;" and later had an affair with a third woman. *Id.* "The trial court reasoned that this evidence was relevant to plaintiff's credibility," and it was admitted. *Id.* Finding the trial court erred, the appellate court observed: "Ordinarily, evidence of marital infidelity would be inadmissible on grounds that it lacks relevance and amounts to a 'smear' upon the [witness's] character." *Id.* at 1026, citing (*Smith v. Commonwealth*, 904 S.W.2d 220, 222 (Ky. 1995). Because the evidence related to the affair did not relate to the substantive issues of "whether Winfred's vehicular accident was caused by a tire defect, as he asserted, or by overloading the van with produce, as [the defendant] contended," the appellate court concluded the evidence should not have been admitted. *Id.* at 1027, 1029.

In contrast, testimony regarding the relationship between Plaintiff and Mr. Nicholas is sought as support for the defendants' theory that the relationship motivated Plaintiff's actions, and is not merely

9

1 related to the collateral issue of credibility.

                2.      Relevance as to Defendants' theory of the case

Notably, the *Winfred* court also acknowledged that evidence related to "an extramarital affair may be admissible where it has a connection to a substantive issue and goes to motive." *Id.*, 165 Cal.App.4th at 1026. While the relationship between Plaintiff and Mr. Nicholas is not the substantive issue in this action, Defendants have made it clear their theory of the case rests on Plaintiff's *motive* to fabricate allegations of sexual harassment to secure the Three-Way Chevrolet account and work with Mr. Nicholas. Thus, the Court finds the defendants have met the burden to demonstrate the discovery sought is relevant to the defendants' theory of the case, as required by Rule 26.

      **C.**      **Right to Privacy under Fed. R. Evid. 412**

The parties disagree regarding whether Rule 412 of the Federal Rules of Evidence is applicable in this action. (*See* Doc. 71 at 15, 19) According to Plaintiff, Rule 412 "governs this dispute," and is applied to "both admissibility and discoverability in cases involving sexual misconduct." (*Id.* at 19-20) (emphasis omitted, citing *Barta v. City of Honolulu*, 169 F.R.D. 132 (D. Hawaii 1996)) On the other hand, the defendants contend Rule 412 does not govern because "Defendants do not seek testimony regarding Plaintiff's sexual history or the intimate details of her relationship with Nicholas (or others)." (Doc. 71 at 15) In addition, the defendants assert they "do not seek to know whether Plaintiff had sex with Nicholas, what they did in their personal time, or what they did in Denver (other than to determine whether the traveled together and whether the trip was personal or related to KGET business)." (*Id.*)

Notably, Rule 412 governs the use of evidence that "is not admissible in a civil or criminal proceeding involving alleged sexual misconduct." Fed. R. Evid. 412(a). Rule 412 prohibits "(1) evidence offered to prove that a victim engaged in other sexual behavior; or (2) evidence offered to prove a victim's sexual predisposition." *Id.* In civil cases, "he court may admit evidence offered to prove a victim's sexual behavior or sexual predisposition if its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." *Id.*, Fed. R. Evid. 412(b). Here, the defendants do not seek discovery prohibited by Rule 412, such as evidence regarding whether Plaintiff engaged in sexual behavior with Nicholas, or evidence related to Plaintiff's sexual

predisposition. Thus, the Court finds Rule 412 does not govern this dispute, and the right to privacy under Rule 412 is not implicated.

### D. Additional Testimony from Plaintiff

Plaintiff contends, "She testified on multiple occasions that as of December 2016, they were good friends, but platonic. That should be the end of the inquiry." (Doc. 71 at 18) Specifically, Plaintiff testified that as of December 26, 2016, she and Mr. Nicholas were "very … just friends, good friends." (Doc. 71-1 at 9, Depo. 102:21-23) She also testified as follows:

> Q. Ms. Gordon, were you having a romantic relationship with Mr. Ted Nicholas as of December 26, 2016?
> A. Romantic meaning dating intimate?
> Q. Yes.
> A. Intimacy?
> Q. Yes.
> A. No.

(Doc. 71-1 at 10, Depo. 106:5-12) When asked if they were platonic friends in December 2016, Plaintiff responded, "yes." (*Id.*, Depo. 102:24-25) However, Plaintiff also testified that as of the deposition, their relationship was "still platonic" (*id.* at 14, Depo. 165:7-10), despite also testifying their relationship had turned from friendship to romantic. (*Id.* at 11, Depo. 129:4-19) Thus, it is not clear what Plaintiff meant when she testified the relationship was "platonic," and what the status of the relationship was in December 2016.[1]

At this juncture, the Court need not define the relationship between Plaintiff and Mr. Nicholas. However, the defendants are entitled to discovery that would assist the finder of fact in evaluating the nature of the relationship, and whether that relationship would motivate Plaintiff's actions or cause bias on the part of Mr. Nicholas. Thus, the Court finds discovery about the relationship between Plaintiff and Mr. Nicholas to be relevant and discoverable. However, these inquiries are limited to information such as the frequency of communications between the two and the extent to which these communications concerned matters not merely connected to a business context, whether they traveled together and whether this travel was merely for business or for personal reasons is. Defendants are

---

[1] Notably, Plaintiff now argues that "[a] platonic relationship changes to a romantic relationship when there becomes physical intimacy." (Doc. 71 at 8) This argument cannot be reconciled with her testimony that in both December 2016 *and* after February 2017, she and Mr. Nicholas had a "platonic" relationship.

11

entitled to ask Plaintiff additional questions regarding about these contacts with Mr. Nicholas during the period from October 2016 through December 2016, including determining whether he is the individual identified as "T" in her therapist's treatment notes. Defendants are not permitted to inquire *generally* into Plaintiff's relationship with Mr. Nicholas, and may not seek information related to their physical, intimate relationship, if any.

### IV. Conclusion and Order

Based upon the foregoing, the Court **ORDERS**:

1. Defendants' motion to compel discovery (Docs. 69, 71) is **GRANTED**;
2. Plaintiff **SHALL** testify as to whether the individual identified as "T" referenced in the December 14, 2016 and December 22, 2016 entries in her therapy notes was Nicholas, and clarify the nature of their relationship in December 2016; and
3. Defendants **SHALL NOT** ask Plaintiff questions regarding the intimate details of her relationship with Nicholas.

IT IS SO ORDERED.

Dated: **November 11, 2018**     **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE

12